UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| DANIELLE KURMAN, | CASE NO. 1:23-CV-00019-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, |  |
| Defendant. |  |

## INTRODUCTION

Plaintiff Danielle Kurman challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 3, 2023, the parties consented to my exercising jurisdiction pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #8). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

After a prior unfavorable decision, Ms. Kurman filed for DIB and SSI on September 3, 2020, alleging a disability onset date of December 1, 2019. (Tr. 179, 191). The claim was denied initially and on reconsideration. (Tr. 179-203, 208-31). She then requested a hearing before an Administrative Law Judge. (Tr. 249). Ms. Kurman (represented by counsel) and a vocational expert

(VE) testified before the ALJ on January 11, 2022. (Tr. 119-47). On January 25, 2022, the ALJ issued a written decision finding Ms. Kurman not disabled. (Tr. 89-112). The Appeals Council denied Ms. Kurman's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 2-5; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Kurman timely filed this action on January 5, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.  ADMINISTRATIVE HEARING

On January 11, 2022, Ms. Kurman appeared for a telephonic hearing before the ALJ. (Tr. 121-22). She had a valid driver's license but only drove to and from medical appointments. (Tr. 124). Ms. Kurman testified she had a four-year degree and had worked as a social worker. (Tr. 123-24). She ran trainings for foster parents and adoptions, requiring her to be in the car a lot, work late, and perform a lot of sitting, typing, and paperwork. (Tr. 125). In this position, she was also required to lift and carry, estimated at 30 to 50 pounds. (*Id.*) She was also required to make home visits. (Tr. 125-26). She had past management experience, including hiring and firing responsibilities, and supervised seven to ten social workers in these positions. (Tr. 126-27).

Ms. Kurman testified that since her last hearing in 2019, the pain in her right hand had increased. (Tr. 128). She described the pain as "excruciating" and stated she "was begging my pain doctor to remove my finger." (*Id.*). She now has a peripheral nerve stimulator for her right hand, which helps a little, but she still has pain. (*Id*). She also described increased pain in her right arm and shoulder, with sensitivity in her left elbow when wearing clothes at times. (*Id.*). Her back pain was recently diagnosed as fibromyalgia, and constantly hurts. (*Id.*).

She stated her doctor wished her to try a new medication but had held off on this medication due to her having issues with her liver because of all the medications she was prescribed. (*Id.*) She had a pain pump installed at the end of 2019 that dispenses fentanyl. (Tr. 129, 134). The amount and frequency of medication has increased since the pump was first installed. (Tr. 129). The medication is administered as a bolus; she started with five boluses administered per day, then increased to seven, then eight. (*Id.*). At the time of the hearing, she was at the maximum dosage of ten boluses per day. (*Id.*). She was permitted one bolus of medication per hour; by 5:00 p.m. she had usually reached her maximum daily dosage and could no longer take additional doses. (*Id.*). Her medications cause her to be tired, lightheaded, sleepy, and have increased her risk of falls. (Tr. 130).

In addition to the pain pump, Ms. Kurman also receives ketamine infusions. (*Id.*) She used to receive one infusion per month; at the time of the hearing, she stated her last infusion had been in September 2021 and she was scheduled for another infusion in February 2022. (*Id.*). The administration of the ketamine infusions lasts for most of the day; she would arrive at the hospital around 6:00 a.m. and would not be released until 2:00 or 3:00 p.m. that afternoon. (Tr. 130-31). She testified to becoming very fatigued after the infusions; she will sleep the rest of the day and remain in bed for one or two days after the infusion. (Tr. 131).

Ms. Kurman also takes gabapentin for pain. (*Id.*). She had been on hydroxyzine prescribed by her psychiatrist but that had been discontinued because of interactions with fentanyl and concerns with the effect of medications on her liver. (Tr. 134). Ms. Kurman testified she has some days that are better than others, but she does not have any days where she is free from pain

altogether. (Tr. 131.). She generally has four or five bad days per week where she stays in bed or on the couch with a heating pad. (Tr. 132).

As to her right hand, Ms. Kurman has difficulty writing, typing, and gripping things. (Tr. 133). She often drops things from her right hand. (*Id.*). On her left arm, two fingers often remain bent, making it difficult to grip or lift things. (*Id.*). If she lifts with her left arm, her shoulder is in extreme pain. (*Id.*). She cannot lift more than five or ten pounds. (*Id.*). She testified she cannot make a fist with either hand, and that her right ring finger has atrophied and cannot stretch out fully, as well as having problems with the left ring and middle fingers. (Tr. 137-38).

She cannot get comfortable at night due to her various pain points on her left and right sides and back. (Tr. 133-34). She testified to only getting about three hours of sleep most nights. (Tr. 134). Due to fatigue, she naps most of the day. (*Id.*).

Ms. Kurman lives with her father, who takes care of her. (Tr. 135). He will take her to the doctor when she is unable to drive. (Tr. 136). He has hired cleaning staff because she cannot clean. (*Id.*). He makes dinner, cooks, and does the shopping. (*Id.*). She tries to help with laundry, but her father must carry the laundry basket over to the washing machine. (*Id.*). She needs his help to shampoo her hair. (Tr. 138). Her hair is not styled. (*Id.*). At most, Ms. Kurman can do a little light dusting or put laundry in the washing machine. (Tr. 134.). Even this level of activity tires her and she suffers for it the next day. (*Id.*). She has a dog and can sometimes take him out to go to the bathroom or her dad will help her. (Tr. 139).

She has traveled with her father to Florida and Oklahoma. (*Id.*). She testified she did horribly on these trips, and that the travel set her back and caused her to be bedridden for two days afterward. (*Id.*). Her father did all the driving, and they stopped at least once every hour to

4

walk around and stretch. (*Id.*). She stated that when her dad goes somewhere, she must go with him. (*Id.*). She has fallen in the shower and down the stairs, leaving her afraid to be alone. (*Id.*).

The VE then testified. The VE testified that a person of Ms. Kurman's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform Ms. Kurman's past work as a social worker or casework supervisor. (Tr. 140-41). However, such an individual could perform light, unskilled work as an Office Helper, Price Marker, or Mail Room Clerk. (Tr. 111-12, 141-43). The VE also testified that employers tolerate up to ten percent off-task time and one monthly absence on average, including arriving late and leaving early. (Tr. 143). It would be work preclusive if the individual required two extra breaks per day of twenty or thirty minutes. (Tr. 143-44).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Kurman was 50 years old on the alleged onset date, and 52 years old at the administrative hearing, making her an individual closely approaching advanced age under the regulations. (Tr. 111). Ms. Kurman has at least a high school education. (*Id.*). In the past, Ms. Kurman has been employed in skilled work as a social worker and as a casework supervisor. (*Id.*).

## III.   RELEVANT MEDICAL EVIDENCE[1]

### A.    Evidence during the period under adjudication

On February 10, 2020, Ms. Kurman treated with pain management specialist, Al-Amin Khalil, M.D., for refill and maintenance of her pain pump. (Tr. 475). Dr. Khalil noted past medical history significant for CRPS of the left upper extremity status post spinal cord stimulation

---

[1]      Ms. Kurman only raises error with respect to her physical impairments, *i.e.*, those relating to her diagnosis of Complex Regional Pain Syndrome ("CRPS"). (*See* ECF #11, PageID 1021-27). I therefore summarize here only those records relating to her physical impairments.

implant and subsequent removal, and status post pain pump placement with ziconotide, fentanyl, and bupivacaine. (*Id.*). Ms. Kurman reported right elbow pain and 5/10 right hand pain, and good pain relief with medication infusion. (*Id.*). Dr. Khalil administered a refill of ziconotide, fentanyl, and Marcaine and recommended return for pump refill on April 10, 2020. (Tr. 477).

On March 6, 2020, Ms. Kurman treated with pain management specialist Salim Hayek, M.D., complaining of diffuse body pain of 6/10 from her neck down to her low back, with significant pain where her spinal cord stimulator had been. (Tr. 426). She reported improvement with her left upper extremity pain while using the pain pump and reported finding relief with using the personal therapy manager (PTM) bolus button. (*Id.*). Ms. Kurman's physical exam was normal. (Tr. 428). Dr. Hayek noted Ms. Kurman's symptoms were consistent with fibromyalgia. (Tr. 429). He recommended that the mainstay treatment for fibromyalgia is low-impact aerobic exercise for one hour per day, six days per week. (*Id.*).

On April 9, 2020, Ms. Kurman returned to Dr. Hayek for refill and maintenance of her pain pump and noted low back pain. (Tr. 430). Ms. Kurman reported very good pain relief with her current medication infusion, between 50 and 75%. (*Id.*). She complained of confusion and worsening memory loss over the last six months. (*Id.*). On examination, Ms. Kurman was oriented, in no acute distress, had normal vitals and gait, and her pump site was well-healed. (Tr. 432). Dr. Hayek decreased the setting on the pain pump by 17% due to Ms. Kurman's worsening memory and confusion. (Tr. 433). Dr. Hayek changed the next refill prescription to ziconotide, bupivacaine, and fentanyl. (*Id.*) Dr. Hayek indicated the ziconotide could lead to some confusion, so he modified the concentration of the pain pump medications to increase the concentration of fentanyl and bupivacaine. (Tr. 434).

6

On May 22, 2020, Ms. Kurman attended an appointment with Dr. Khalil for refill of her pain pump. (Tr. 465). She reported inadequate pain relief from the pump; she also complained of worsening pain in the right upper extremity. (*Id.*). She believed the pump had been programmed incorrectly after a settings change during the last visit and requested a pump adjustment. (*Id.*). She noted her memory loss and confusion had not been worsening and was not concerned for those symptoms. (*Id.*). She reported right arm pain at 6/10. (*Id.*). On examination, Dr. Khalil noted diffuse tenderness to palpation in all fibromyalgia tender points, as well as a grossly normal gait. (Tr. 468). Dr. Khalil refilled the pump with ziconotide, bupivacaine, and fentanyl and started Ms. Kurman on gabapentin with instructions to titrate to a goal of 600 mg three times daily. (*Id.*).

Ms. Kurman presented to Dr. Khalil on July 6, 2020, requesting a medication change to help with her right arm CRPS pain. (Tr. 457). Ms. Kurman stated the pain pump had been helping since the last adjustment, but she also believed higher doses were necessary to control her sharp, shooting right arm CRPS pain. (*Id.*). On examination, she had an abnormal musculoskeletal exam, was not oriented to person, place, or time, and a depressed mood. (Tr. 459). Dr. Khalil discontinued the ziconotide and increased the fentanyl and bupivacaine concentrations. (Tr. 460).

On February 26, 2021, Ms. Kurman presented to Dr. Khalil for refill of her pain pump. (Tr. 835). Dr. Khalil administered a diagnostic median nerve block and decreased her PTM maximum to five boluses per day. (*Id.*). He discussed peripheral nerve stimulation as possible treatment for her right hand pain. (*Id.*). Ms. Kurman was oriented and her physical examination was generally within normal limits. (Tr. 833).

On June 25, 2021, Ms. Kurman treated with Dr. Khalil for right hand pain. (Tr. 817). Dr. Khalil noted the peripheral nerve stimulator trial was successful and would consider permanent

implant after insurance approval. (*Id.*). Ms. Kurman reported more than 80% pain relief during the visit; she reported having almost no pain and had better sleep and function. (*Id.*). Dr. Khalil implanted the permanent peripheral nerve stimulator on September 13, 2021. (Tr. 901-02).

**B.      New evidence submitted to the Appeals Council**

Visit notes from Dr. Khalil on November 1, 2021 indicated Ms. Kurman has fibromyalgia and receives intermittent ketamine infusions with some short-term relief. (Tr. 80). She reported 80% pain relief from the recent peripheral nerve stimulator implanted in the right forearm. (*Id.*). She reported the pain pump also helped with the pain in her right upper extremity. (*Id.*). She was weaning herself off gabapentin because she did not believe it was helping her pain and it was making her tired. (*Id.*). Dr. Khalil noted a prior transforaminal epidural steroid injection in her low back that did not provide relief; he estimated it was because her primary pain etiology was likely due to fibromyalgia. (*Id.*). Dr. Khalil recommended additional care from a chiropractor, stretching, and physical exercise. (*Id.*). Ms. Kurman reported 7/10 pain, but also that she was overall satisfied with the therapy she was receiving. (Tr. 81). Physical examination was normal and she did not appear to be in acute distress. (Tr. 83).

On November 8, 2021, Ms. Kurman met with Dr. Khalil for follow-up on the duration of pain relief and insensitivity for the arm, including an x-ray of the right forearm to locate the stimulator wave lead. (Tr. 16). Ms. Kurman reported more than 70% pain relief and requested the ulnar nerve stimulation be installed permanently. (*Id.*).

On November 22, 2021, Ms. Kurman attended an appointment with Dr. Khalil for a pain pump refill. (Tr. 76). Dr. Khalil noted the pump concentration of fentanyl and Marcaine, with bolus up to eight times per day (decreased from ten per day). (*Id.*). Ms. Kurman had a generally

normal examination and appeared in no acute distress. (Tr. 78-79). However, Dr. Khalil noted on examination she had 5/5 grip strength in her bilateral hands, and visible wincing with grip of the right hand. (Tr. 79). Ultrasound examination of the right medial and ulnar nerve noted a small perineural effusion at the proximal wrist crease with no direct contact between the stimulator leads and nerves. (*Id.*).

On December 27, 2021, Ms. Kurman treated with Dr. Khalil for her pain pump refill. (Tr. 72). Dr. Khalil noted no changes since her last visit. (*Id.*). She has treated with multiple modalities and was currently on an intrathecal pump with fentanyl and Marcaine, with bolus up to ten times per day (increased from eight per day). (*Id.*). She was recommended for refill on or before February 22, 2022. (Tr. 75).

On March 7, 2022, Ms. Kurman was complaining of neuropathic pain in her right hand, with neuroma around the stitch side of the peripheral nerve stimulator. (Tr. 68). Dr. Khalil noted that if the pain persists, he will schedule for revision of the stage side of the stimulator. (*Id.*) On March 29, 2022, Dr. Khalil performed a revision of Ms. Kurman's previously implanted right upper extremity median ulnar nerve stimulator. (Tr. 61-62). On May 13, 2022, Dr. Khalil noted wound infection after surgery, and that the upper arm incision was not healed. (Tr. 55). He rebandaged the wound and requested she follow up in two weeks. (*Id.*). If the wound reopened again, Dr. Khalil would refer to a plastic surgeon for skin reconstruction. (*Id.*).

On June 10, 2022, Ms. Kurman attended an appointment with Dr. Khalil for lidocaine patches and follow-up on the wound infection. (Tr. 33-34). Dr. Khalil noted the wound had healed, but he recommended consulting with a plastic surgeon. (*Id.*). He indicated that at the next pump refill he would increase the fentanyl and bupivacaine concentrations but keep the same

settings. (*Id.*). During this visit, Ms. Kurman complained of new bilateral foot pain. (Tr. 34). On examination, she was awake and oriented in all three spheres, had normal vitals, was in no acute distress, and had a normal gait. (Tr. 36).

On July 12, 2022, Ms. Kurman attended an appointment with Dr. Khalil complaining of right thigh numbness as well as pain in her right hand, worsened with wrist extension. (Tr. 27-28). Dr. Khalil estimated it was likely due to lead removal on the right forearm and recommended she use lidocaine cream and a TENS unit for pain relief, as well as administration of a right sided nerve block. (*Id.*). Ms. Kurman reported no relief from Lidoderm patch on her right forearm, and that the bolus dose and gabapentin 600 mg three times daily provided minimal right upper extremity relief but adequate relief of pain in the left arm. (Tr. 28). Physical examination was generally normal, although Dr. Khalil noted allodynia of the right medial forearm; hyperalgesia of the fingers of the right hand; sensory intact of the bilateral upper extremities to pinprick and cold; 5/5 strength in the upper and lower extremities; and vasomotor and sudomotor changes in the right lower forearm. (Tr. 31). Ms. Kurman reported improvement in pain and full range of motion of the right wrist after administration of the nerve block. (*Id.*).

Ms. Kurman followed up with Dr. Khalil on August 26, 2022. (Tr. 21). He noted that he had intended to increase the fentanyl dosage in her pump, but the order was not placed by the time of that visit; yet he was able to administer to 100 mcg/cc of fentanyl during refill. (Tr. 21, 25). She had seen a plastic surgeon but no surgical intervention was offered. (Tr. 22). The ulnar nerve block provided good pain relief for four days. (*Id.*). Physical examination was normal. (Tr. 24-25).

IV.   MEDICAL OPINIONS

    A.   **Consultative Examinations**

On March 9, 2020, Ms. Kurman met with neurologist Ahmad Siddiqi, M.D., for neurologic evaluation related to her memory and balance problems. (Tr. 437-40). Ms. Kurman reported having balance and memory loss issues starting six months prior. (Tr. 437). Physical examination was generally within normal limits, although Dr. Siddiqi noted reduced short-term but normal long-term memory. (Tr. 439). Ms. Kurman scored one out of five on delayed recall. (Tr. 439-40). Dr. Siddiqi noted that dementia was unlikely, but the cognitive issues may be due to metabolic dysfunction and/or medication effect. (Tr. 440). CT myelogram report of the entire spine conducted on December 19, 2019 noted no severe spinal canal stenosis. (*Id.*). Her neurological exam was normal for balance and coordination. (*Id.*).

Dr. Siddiqi referred Ms. Kurman to Lindsay Miller Scott, Ph.D., for neuropsychological assessment in the context of memory concerns. (Tr. 570). Dr. Miller Scott noted significant medical history including an accident in 2013 that resulted in CRPS, as well as potential for adverse cognitive effects due to depression, anxiety, conditions causing pain, and possible medication effects. (*Id.*).

On examination, Ms. Kurman was alert and oriented, cooperative, and put forth good effort during testing, although Dr. Miller Scott documented a notable level of distress. (Tr. 572, 574). Dr. Miller Scott estimated Ms. Kurman's premorbid intellectual functioning fell in the upper end of the average range; on testing, her auditory attentional capacity was average, basic working memory was borderline, and complex working memory was low average. (Tr. 574). Overall, Dr. Miller Scott found memory and other cognitive deficits in the context of multiple risk factors,

11

including persisting mood/anxiety symptoms, stress, chronic pain, medication effects, and poor sleep. (Tr. 575). Dr. Miller Scott recommended follow up with her mental health care providers, continuing with pain management, and better sleep hygiene, staying active, and increased structure and organization. (Tr. 575-76). Dr. Miller Scott recommended reevaluation in 18 to 24 months to monitor cognitive status. (Tr. 576).

On February 17, 2021, Ms. Kurman underwent a mental status evaluation for assessment of her understanding and memory, sustained concentration and persistence, and social interaction and adaption at Rainbow Counseling Center, Inc., conducted by a Dr. Brown.[2] (Tr. 697-702). Dr. Brown indicated Ms. Kurman would have little difficulty in understanding instructions, although she may have difficulty remembering instructions because she observed some memory deficits during the interview. (Tr. 700). She had somewhat impaired ability to perform simple and multi-step tasks. (Tr. 701). Dr. Brown indicated Ms. Kurman's anxiety symptoms would make it more difficult for her to interact appropriately with coworkers and supervisors and would interfere greatly with her ability to withstand the stresses and pressures associated with day-to-day work activity. (*Id.*).

B.  **State Agency Reviewers.**

At the initial review, on February 11, 2021, Indira Jasti, M.D., opined Ms. Kurman could perform light work with additional limitations including occasional push/pull with the bilateral upper extremities, occasional reach overhead with the left upper extremity, frequently handle and finger with the bilateral upper extremities. (Tr. 184-87; 197-99). Bonnie Katz, Ph.D., opined on

---

[2]     Providers at Rainbow Counseling Center include Claudia E. Johnson Brown, Ph.D., and Vernon E. Brown, Ph.D. Notes from Ms. Kurman's examination are unsigned, so it is unclear which doctor performed the clinical interview. (*See* Tr. 697-702).

February 20, 2021 that Ms. Kurman could adapt to infrequent changes in routine that are introduced and explained well in advance, in a work setting without strict high production quotas and where supervisory supports are provided to assist with adjusting to new duties or procedures. (Tr. 187, 201). She could maintain attention and concentration to complete short cycle routine tasks; she could make simple decisions but would have difficulty independently managing and prioritizing completing task demands; she could understand and remember simple and familiar task instructions but would need repetition and reminders for unfamiliar or complex instructions. (Tr. 188-89, 200-01).

These findings were affirmed on reconsideration by Steve McKee, M.D., on July 5, 2021 and by Cynthia Waggoner, Psy.D., on July 1, 2021. (Tr. 213-18).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2022.

2.   The claimant has not engaged in substantial gainful activity since December 1, 2019, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: complex regional pain syndrome (CRPS) left upper extremity, degenerative disc disease of the lumbar and cervical spine with spondylosis, lumbosacral neuritis, right side, fibromyalgia, major depressive disorder, generalized anxiety disorder, memory deficit, cognitive deficit, panic disorder, agoraphobia, somatic symptom disorder, and adjustment disorder with mixed anxiety and depressed mood (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except occasionally push/pull with the bilateral upper extremities; occasionally reach overhead on the left; frequently handle and finger with the bilateral upper extremities; occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl; never climb ladders, ropes, and scaffolds; should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle; has the ability to carry out, concentrate, persist, and maintain pace for completing simple, routine, repetitive tasks in work environments with no production rate pace (i.e., assembly line work); no high production quotas; can make simple work related decisions; occasional and superficial interaction with supervisors, coworkers, and the public, with superficial defined as work that does not involve any work tasks such as arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others; and can tolerate occasional changes in a routine work setting.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born in 1969, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education. (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 95-112).

14

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional
        capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f)

and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Kurman brings two issues for review:

1.      Whether remand is appropriate as the administrative law judge failed to
        consider Social Security Ruling 03-02p; and

2.      Whether new and material evidence warrants remand.

(ECF #11, PageID 1018). I address each in turn below.

## I.      The ALJ appropriately considered the factors contained in Social Security Ruling 03-02p.

Ms. Kurman argues the ALJ's decision regarding her CRPS was not supported by

substantial evidence. (ECF #11, PageID 1021). She specifically argues that although the record

substantiates, and the ALJ agrees, that CRPS is her main disabling impairment, the ALJ did not

consider the appropriate Social Security Ruling, SSR 03-02p, which sets out the standard for

17

evaluating cases involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome (RSDS/CRPS). (*Id.*).

The Commissioner argues that, even though the ALJ did not explicitly cite SSR 03-02p in her decision, the ALJ appropriately considered Ms. Kurman's CRPS diagnosis and weighed the available evidence in the context of the appropriate Ruling and that substantial evidence supports her decision. (ECF #13, PageID 1046-49). The Commissioner further argues that Ms. Kurman's argument should be rejected as contrary to established Sixth Circuit precedent holding that "even if an ALJ's decision 'does not explicitly cite SSR 03-02p' it is not reversible error so long as the 'decision clearly comports with the five-step sequential evaluation process for [the] claims prescribed by the ruling.'" (*Id.* at PageID 1046) (quoting *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 439 (6th Cir. 2017)).

SSR 03-02p explains SSA's policies for evaluating disability claims based on CRPS. SSR 03-02p, 2003 WL 22399117 (Oct. 20, 2003). These terms are synonymous and describe a "chronic pain syndrome most often resulting from trauma to a single extremity," but can also result from diseases, surgery, or injury affecting other parts of the body. *Id.* at *1. According to the Ruling:

> The most common acute clinical manifestations of RSDS/CRPS include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain is out of proportion to the severity of the injury sustained by the individual.

*Id.* Individuals with RSDS/CRPS "typically report persistent, burning, aching or searing pain that is initially localized to the site of the injury. The involved area usually has increased sensitivity to touch." *Id.* at *2. Diagnosing RSDS/CRPS requires the presence of complaints of persistent, intense pain resulting in impaired mobility of the affected region. *Id.* The complaints are

18

associated with (1) swelling; (2) autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), skin temperature changes, or abnormal pilomotor erection (gooseflesh); (3) abnormal hair or nail growth (either too slow or too fast); (4) osteoporosis; or (5) involuntary movements of the affected region of the initial injury. *Id.* Cases may progress and spread to other limbs or to remote parts of the body. *Id.*

When documented by appropriate medical signs, symptoms, and lab findings, RSDS/CRPS constitutes a medically determinable impairment at Step Two of the sequential analysis process. *Id.* at *4. For purposes of disability evaluation, the impairment can be established in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and one or more of the above-described clinically documented signs in the affected region at any time following the documented precipitant. *Id.* "When longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators can reliably determine that RSDS/CRPS is present and constitutes a medically determinable impairment." *Id.*

Importantly, it is the individual's complaints of pain, not the clinically documented signs, that must be persistent. *See id.* ("It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of RSDS/CRPS, and do not affect a finding that a medically determinable impairment is present."). Due to the transitory nature of objective findings, SSR 03-02p instructs adjudicators that "[c]larification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources." *Id.* at *5.

Once the disorder is established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. *Id.* at *6. If the adjudicator finds that pain or other symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to perform basic work activities, a "severe" impairment must be found to exist. *Id.*

Because RSDS/CRPS is not a specifically listed impairment, an individual with the condition alone cannot be found to have an impairment that meets the requirements of a listed impairment at Step Three of the sequential evaluation. *Id.* However, the specific findings should be compared to any pertinent listing to determine whether medical equivalence exists. *Id.*

When the ALJ determines the individual's impairment does not meet or equal any listed impairment, the ALJ must assess the individual's residual functional capacity (RFC) and proceed to Step Four and, if necessary, Step Five of the sequential evaluation. *Id.* at *7. In determining the RFC, all the individual's symptoms must be considered in deciding how such symptoms may affect functional capacities. *Id.* Careful consideration must be given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. *Id.*

The Commissioner correctly notes that the Sixth Circuit, and district courts within it, regularly hold that failure to reference SSR 03-02p explicitly is not reversible error if the decision follows the five-step evaluation process. (ECF #13, PageID 1046) (collecting cases). In *Shepard*, the Sixth Circuit explained that an explicit reference to SSR 03-02p is not required if "the decision clearly comports with the five-step sequential evaluation process for RSD[/CRPS] claims

20

prescribed by the ruling." 705 F. App'x at 439. This is because "[t]he sequential evaluation process is not particular to RSD claims; rather, '[c]laims in which the individual alleges RSDS/CRPS are adjudicated using the sequential process, *just as for any other impairment*.'" *Id.* (quoting SSR 03-02p, 2003 WL 22399117, at *6) (emphasis in original). Thus, failure to cite SSR 03-02p is not fatal to an ALJ's analysis of CRPS. *Gradascevic v. Comm'r of Soc. Sec.*, No. CV 16-12998, 2017 WL 4946577, at *8 (E.D. Mich. July 31, 2017), *report and recommendation adopted*, 2017 WL 3866434 (E.D. Mich. Sept. 5, 2017). Rather, reversible error can occur where the ALJ does not reference CRPS in the decision and it is not clear whether the ALJ considered its effect in the sequential evaluation process. *Darabed v. Astrue*, No. 1:10CV2626, 2011 WL 7456148, at *8 (N.D. Ohio Dec. 6, 2011), *report and recommendation adopted*, 2012 WL 715863 (N.D. Ohio Mar. 5, 2012) ("the ALJ failed to follow SSR 03-2p because although he did discuss [the plaintiff's] allegations of pain, he did not even mention, let alone discuss, [the plaintiff's] claim of CRPS.").

Here, Ms. Kurman is correct that the ALJ's decision does not cite SSR 03-02p. (*See* Tr. 89-112). But I do not find the ALJ failed to consider the effects of CRPS when conducting the sequential evaluation process. Rather, at Step Two, the ALJ found that Ms. Kurman's CRPS is a medically determinable impairment that is severe. (Tr. 95). She then followed the effects of Ms. Kurman's CRPS diagnosis through the remaining steps of the sequential evaluation process. (*See id.* at 95-112). For example, at Step Three, the ALJ considered CRPS in conjunction with Ms. Kurman's right-sided lumbosacral neuritis to find it did not meet the requirements of Listing 11.14B (peripheral neuropathy):

> The undersigned has considered whether the claimant's medical conditions, including right sided lumbosacral neuritis, satisfy the requirements of listing 11.14 (peripheral neuropathy); however, the record is absent sufficient objective evidence to support this listing. The medical record contains evidence of right sided

lumbosacral neuritis and left upper extremity CRPS, resulting in tenderness, limited range of motion of the fingers and right wrist, and occasional left elbow allodynia on examination. However, the record fails to establish disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use of the upper extremities, as examinations have revealed generally full strength, normal reflexes, generally intact sensation, and a generally normal gait with independent ambulation. In addition, the claimant is able to care for a pet dog, do laundry, independently care for her personal hygiene, travel out of state, drive, walk for exercise, and use social media. Thus, listing 11.14A is not met. Furthermore, as set forth below, the record is absent sufficient objective evidence of marked limitation in physical functioning in conjunction with marked limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. Thus, listing 11.14B is not met.

(Tr. 96) (citations omitted).

The ALJ's conclusion accords with SSR 03-02p:

Since RSDS/CRPS is not a listed impairment, an individual with RSDS/CRPS alone cannot be found to have an impairment that meets the requirements of a listed impairment. However, the specific findings in each case should be compared to any pertinent listing to determine whether medical equivalence may exist. Psychological manifestations related to RSDS/CRPS should be evaluated under the mental disorders listings, and consideration should be given as to whether the individual's impairment(s) meets or equals the severity of a mental listing.

SSR 03-02p, 2003 WL 22399117, at *6. At Step Three, the ALJ both evaluated Ms. Kurman's CRPS diagnosis under a "pertinent listing" – Listing 11.14B – and also considered CRPS related to her mental functioning. Ultimately, the ALJ found the CRPS diagnosis did not meet the relevant listing. I see no reversible error.

At Steps Four and Five, the ALJ continued to consider the effects of Ms. Kurman's CRPS:

- The medical record confirms a history of chronic pain syndrome and complex regional pain syndrome (CRPS) of the left upper extremity, for which the claimant underwent IPG with revision. (Tr. 100).

- A psychological consultative examination conducted in July 2018, in conjunction with a prior disability application, yielded diagnoses of somatic symptom disorder, with predominant persistent severe pain, adjustment

disorder with mixed anxiety and depressed mood, and a global assessment of functioning (GAF) score of 50. Examiner Roger Bash, Ph.D., noted that a severely painful right upper extremity CRPS condition had been the precipitant of her current depression and anxiety. (Tr. 10) (citations omitted).

- On May 13, 2020, the claimant underwent neuropsychological evaluation with Lindsay Miller Scott, Ph.D. The claimant reported CRPS stemming from a 2013 accident, for which she now had an intrathecal pump. The claimant complained of cognitive changes, with more marked worsening following placement of a pain pump in early 2019, and she admitted exacerbated symptoms with stress, depression, and anxiety. The claimant indicated currently elevated anxiety symptoms, but stable depression. Mental status examination revealed a notable level of distress. However, the claimant was alert, oriented, pleasant, and cooperative, and rapport was easily established. Evaluation revealed normal speech, unremarkable comprehension in terms of the claimant's ability to understand interview questions, adequate frustration tolerance and ability to focus on tasks, efficient pace, good mental stamina, and the claimant worked diligently throughout examination. Testing revealed mildly impaired executive functioning, average to mildly impaired to moderately impaired memory, and low average processing speed. Dr. Scott diagnosed the claimant with memory deficits and cognitive deficits. She subsequently advised the claimant that her memory pattern on testing was not suggestive of an amnestic process. Dr. Scott referred the claimant to neuropsychiatric rehabilitation and recommended continued treatment with her mental health providers. (Tr. 101-02) (citations omitted).

- Pain related treatment for the claimant's medical impairments has been primarily with Al-Amin Khalil, M.D., and Salim Hayek, M.D., both of UH. Records from both providers dated August 2019 through September 2021 contain reports of diffuse general body pain, especially in the low back and right upper extremity; however, the claimant also often admitted improved symptoms with the pain pump. Treatment notes confirm a history of fibromyalgia and CRPS, status post spinal cord stimulator in the cervical and lumbar spine placed in 2014 and removed in 2019, followed by placement of a pain pump in 2019. Examinations conducted throughout the course of treatment revealed diffuse tenderness to palpation in multiple fibromyalgia tender points, tenderness to palpation of the bilateral upper extremities, occasionally limited range of motion of the left second finger, right wrist, and right fourth finger, occasional left elbow allodynia to touch with erythema, and an occasionally depressed mood. However, examinations confirmed normal heart, lungs, and abdomen, otherwise normal extremities, with no edema, otherwise normal joints, with no increased warmth, full upper and lower extremity strength, otherwise

normal sensation, normal reflexes, a consistently normal gait with independent ambulation, and a normal affect. Dr. Khalil and Dr. Hayek diagnosed the claimant with complex regional pain syndrome of the left upper extremity, fibromyalgia, low back pain, neuropathic pain of the right hand, lumbosacral neuritis of the right side, and anxiety, prescribed gabapentin 300-600 mg, administered occasional ketamine infusions for fibromyalgia, and refilled the claimant's pain pump. They recommended exercises for fibromyalgia and referred the claimant to aqua therapy. On June 11, 2021, the claimant underwent transforaminal epidural steroid injections at the right L5-S1 level. In June 2021, the claimant underwent a successful peripheral nerve stimulation (PNS) trial, after which Dr. Khalil recommended consideration of a permanent PNS implant following insurance approval. On July 18, 2021, the claimant underwent right sided Stimwave trial of the medial and ulnar nerves, and on September 13, 2021, she underwent Stimwave peripheral nerve stimulator implant of median and ulnar nerves in the right forearm. (Tr. 102) (citations omitted).

- On February 17, 2021, the claimant underwent consultative examination with Vernon Brown, Ph.D., complaining of CRPS, depression, anxiety, crying spells, daily panic attacks, impaired attention, concentration, and memory, and sleep problems, and the claimant admitted neglecting her personal hygiene. Mental status examination revealed marginal grooming and hygiene, a depressed mood, a flat, restricted affect, and tearfulness. However, the claimant was pleasant and cooperative, with normal eye contact, motor activity, and speech. Examination revealed somewhat impaired concentration, as the claimant was able to complete 5 steps of a serial 7 tasks, losing her place once. She was able to add one and two digit numbers, and count by 5s up to 100 without error; however, the claimant was unable to divide. Mental status examination revealed somewhat impaired memory, as the claimant recalled only 2 of 3 items after 5 minutes. Dr. Brown noted average range estimated intellectual functioning and fair insight and judgment. He diagnosed the claimant with major depressive disorder, single episode, severe without psychotic features, panic disorder, agoraphobia, and generalized anxiety disorder. (Tr. 103) (citations omitted).

- On October 4, 2021, the claimant underwent functional capacity evaluation with Todd Ott, OTR/L, complaining of pain and easy fatigue. The claimant reported pain with exertional activities and had to rest during evaluation. Examination was notable for diffuse tenderness, only fair core and upper and lower extremity strength, with generalized weakness ranging from 3+ to 4/5, limited postural and manipulative maneuvers, guarded posture, poor balance, and a slow, cautious, antalgic gait. Mr. Ott assessed the claimant with CRPS type 1 of the left upper extremity, low back pain, balance problems, and fibromyalgia. He concluded the claimant currently

requires an increasing amount of breaks during the day to provide relief from pain, and he noted that transitions from standing to bending and lifting from the floor level are unable to be accomplished without increased pain and external assist or support. Mr. Ott opined the claimant is limited to work at the sedentary exertional level. However, he also noted it was his professional opinion that the claimant cannot safely return to any employment position and is unable to perform essential job functions. Mr. Ott opined that safe lifting limit is less than 10 pounds at waist level, and she can tolerate a seated position maximum 20-30 minutes with weight shifts, walking tolerance 160 feet, and standing tolerance less than 5 minutes. Mr. Ott concluded the claimant is unable to safely tolerate position changes and has a generalized weakness with all tasks along with fatigue during activity. He noted the claimant is also unable to perform transitional movements to lower levels and has unsafe mobility patterns to tolerate most job related tasks. (Tr. 103-04) (citations omitted).

- [G]iven the claimant's combined impairments, including degenerative disc disease, lumbosacral neuritis of the right side, left upper extremity CRPS, and fibromyalgia, resulting in tenderness, decreased finger and right wrist range of motion, and occasional left upper extremity allodynia on examination, additional manipulative restrictions are warranted. Specifically, the claimant can occasionally push/pull with the bilateral upper extremities, occasionally reach overhead on the left, and frequently handle and finger with the bilateral upper extremities. Furthermore, given this evidence, it is reasonable that certain postural maneuvers would pose difficulty if performed constantly. Thus, the claimant can occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl, and never climb ladders, ropes, and scaffolds. Finally, although examinations have revealed full strength, generally intact range of motion, normal reflexes, generally intact sensation, and generally normal ambulation, given the claimant's reported symptoms, combined impairments, and the abnormalities on diagnostic imaging and physical examination set forth above, the claimant should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle. (Tr. 104) (citations omitted).

These excerpts demonstrate that the ALJ considered Ms. Kurman's CRPS diagnosis within the longitudinal record and considered all its effects on Ms. Kurman's abilities. In accordance with SSR 03-02p, the ALJ did not limit her review only to the physical effects of pain or only to records from acceptable medical sources. Rather, the ALJ included the effects of pain on Mr. Kurman's mental health and related functional capacity, and included records from third-party providers

who might not be "acceptable medical sources" such as Mr. Ott when making her determination. In all, the ALJ crafted an RFC with limitations considerate of Ms. Kurman's CRPS and found her capable of work in the national economy. I find no reversible error at Steps Four and Five.

Having thoroughly considered the ALJ's decision in light of the record and in comparison with SSR 03-02p and relevant caselaw, I find the ALJ correctly applied SSR 03-02p's guidance to the facts of Ms. Kurman's claim. I therefore decline remand on this issue.

## II.    The record evidence does not support a Sentence Six remand.

Ms. Kurman argues that new and material evidence submitted to the Appeals Council after the ALJ's hearing warrants remand. (ECF #11, PageID 1026). She argues the evidence contains additional treatment modalities that were not successful in relieving her persistent and chronic pain; had the ALJ considered this evidence, it could have changed the outcome of the ALJ's decision. (*Id.* at PageID 1027).

The Commissioner argues Ms. Kurman has not shown she is entitled to a Sentence Six remand because the evidence submitted does not meet Sentence Six's materiality requirement. (ECF #13, PageID 1049). The materials submitted are continuations of treatment she had received during the longitudinal record already considered by the ALJ; according to established Sixth Circuit precedent, continued treatment, without more, is insufficient to demonstrate a reasonable probability that the ALJ would reach a different conclusion. (*Id.* at PageID 1050).

The Sixth Circuit holds that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision"; it can only consider the evidence as the basis for a Sentence Six remand. *Cline*

26

*v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996). A Sentence Six remand allows a district

court to remand a case to the Commissioner to consider additional evidence if the party seeking

remand shows "there is new evidence which is material and that there was good cause for the

failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g);

*Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir. 1988) ("The statute thus

requires that before a social security claim will be remanded for consideration of additional

evidence, the claimant must prove that new evidence existed which would be material to the

determination of his disability claim.").

      For the purposes of § 405(g), evidence is "new" if it was "not in existence or available to

the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein,* 496 U.S. 617, 626

(1990). "Evidence is material when it concerns the claimant's condition prior to the ALJ's decision

and there is a reasonable probability that the ALJ would have reached a different decision if the

evidence had been presented." *Langford v. Astrue,* No. 1:09CV1629, 2010 WL 3069571, at *5

(N.D. Ohio Aug. 3, 2010) (citing cases). A claimant demonstrates "good cause" by showing a

reasonable justification for the failure to acquire and present the evidence at the hearing before the

ALJ. *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984) (per curiam). This requires

more than just showing the evidence did not exist at the time of the ALJ's decision; the Sixth

Circuit takes a "harder line on the good cause test," and requires the claimant to "give a valid

reason for his failure to obtain evidence prior to the hearing." *Oliver v. Sec'y of Health & Human*

*Servs.,* 804 F.2d 964, 966 (6th Cir. 1986); *see also Saliba v. Comm'r of Soc. Sec.,* No. 1:21-CV-1908,

2022 WL 18811452, at *9 (N.D. Ohio Nov. 3, 2022) (noting that "a claimant cannot simply point

to the fact that the evidence was not created until after the ALJ hearing but must establish good

cause for why she did not cause the evidence to be created and produced until after the administrative proceeding"), *report and recommendation adopted,* 2023 WL 2139372 (N.D. Ohio Feb. 21, 2023).

Here, Ms. Kurman requested review of the ALJ's decision and submitted evidence to the Appeals Council, largely consisting of records from Dr. Khalil (dating both before and after the ALJ's decision), as well as treatment notes from University Hospitals Connor Integrative Health Network. (Tr. 2, 16-88). The Appeals Council determined Dr. Khalil's records from November 1 through December 27, 2021 (*i.e.,* those predating the ALJ's decision) did not show a reasonable probability that they would change the outcome of the decision. (Tr. 2). It determined that the University Hospitals Connor Integrative Health Network records dated June 20, 2022, as well as the later records from Dr. Khalil, did not relate to the period at issue because the ALJ decided Ms. Kurman's case through January 25, 2022. (*Id.*).

Ms. Kurman presents that the evidence is new because "it pertains to [her] treatment received after the hearing decision." (ECF #11, PageID 1027). But receipt of treatment records after the administrative hearing does not, in and of itself, demonstrate the evidence was "new" for purposes of my inquiry. *See Perkins v. Apfel,* 14 F. App'x 593, 598 ("A remand is possible only if [the plaintiff] demonstrates that the evidence is new and material, and that good cause exists for h[er] failure to introduce the evidence at the administrative level. The party seeking remand bears the burden of showing it is proper.") (citations omitted). I note that much, but not all, of the evidence Ms. Kurman submitted to the Appeals Council is new because the treatment records pertain to evidence not in existence at the time of the January 2022 administrative hearing. (*See* Tr. 16-88). However, certain records were available at the time of the administrative hearing but were

28

not produced. (*See* Tr. 72-88). Ms. Kurman does not address good cause for failing to produce those records in her brief. (*See* ECF #11). I therefore find she has not met her burden of showing this evidence is proper under the Sixth Circuit's requirements for consideration of a Sentence Six remand. I limit my review to only those records not in existence at the time of the hearing. (*See* Tr. 16-71).

Ms. Kurman claims the evidence is material because it "relates to the conditions discussed at [her] hearing and in the ALJ's decision and arguably shows a worsening in her condition." (ECF #11 at PageID 1027). She further argues there is a reasonable probability this evidence could have changed the ALJ's decision, because it describes additional treatment which was not successful in relieving her chronic pain. (*Id.*).

As for the records dated after the hearing in January 2022, they are not material because they do not concern Ms. Kurman's condition prior to the ALJ's decision. *Langford*, 2010 WL 3069571, at *5. As Ms. Kurman relates in her brief, these treatment records indicate continued treatment of her chronic pain. (ECF 11, PageID 1026-27). My review of the evidence submitted agrees. (*Compare id. with* Tr. 16-71). But evidence of subsequent deterioration in a claimant's condition after the ALJ's decision is immaterial. *Sizemore,* 865 F.2d at 712. "[I]t is well established that a sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing." *Swain v. Comm'r of Soc. Sec.*, No. 5:21-CV-01542, 2022 WL 3088491, at *25 (N.D. Ohio July 8, 2022), *report and recommendation adopted*, 2022 WL 3083028 (N.D. Ohio Aug. 3, 2022). Instead, if Ms. Kurman's condition substantially worsened after the ALJ's decision, an appropriate remedy is for her to initiate a new claim for benefits alleging onset of disability as of that date. *See Sizemore*, 865 F.2d at 712. Sentence Six remand is

inappropriate to review these records alleging a worsening of the same chronic condition for which the ALJ previously considered in the context of the longitudinal record available at the time of the hearing.

Ms. Kurman is not entitled to remand under 42 U.S.C. § 405(g) because she has not met her burden of showing "there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" Therefore, I decline Ms. Kurman's request to remand the matter.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: December 12, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE